- - - - - - - - - - - - - - - - - - - - - - - - - - - x

MILLENNIUM LABORATORIES, INC., :

     Plaintiff,    :    Civil Action
                No.

   v.          :

AMERITOX, LTD.,       :    **JURY TRIAL DEMANDED**

     Defendant.    :

              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - x

**COMPLAINT FOR**
**INJUNCTIVE RELIEF AND DAMAGES**

Plaintiff Millennium Laboratories, Inc. ("Millennium"), by its undersigned counsel, brings this Complaint for injunctive relief and damages against Defendant Ameritox, Ltd. ("Ameritox") and alleges, upon knowledge with respect to itself and its own acts, and upon information and belief with respect to all other matters, as follows:

**NATURE OF THE ACTION**

1. Millennium and Ameritox are competitors in the clinical testing and drug screening business. Both own and operate laboratories that receive fluid samples from health care professionals and test the samples to determine whether patients are taking prescribed medications or taking non-prescribed or illicit substances. Millennium, after entering the market in 2008, rapidly became an industry leader by providing superior client service, fast turnaround time, accurate and precise testing results, ethically-based decisions, and continuous education and research to benefit patient care.

2. Unable to compete with Millennium through lawful means – and after having its

image scarred by Medicare fraud scandals, serial whistleblower actions by former employees, and a public refutation of its RxGuardian product – Ameritox has resorted to a series of desperate and malicious efforts to disparage Millennium in hopes of retaining its dwindling market share. This conduct has included financing or encouraging frivolous lawsuits against Millennium by former employees and other surrogates, and disseminating false and misleading statements to Millennium's current and potential customers that are designed to discourage use of Millennium's superior product and service.

3.      As one example of Ameritox's shameless conduct, Ameritox has been paying a law firm in Arizona to prosecute a frivolous lawsuit brought by former Millennium employee Kelly Nelson ("Nelson") against Millennium.  See June 26, 2013 Order, Nelson v. Millennium Laboratories, Inc., No. 2:12-cv-01301-SLG (D. Ariz.), Docket No. 185 at 4 ("[I]t is now established that Ameritox has been receiving billing statements for Ms. Nelson's legal representation in this action."); see also Docket No. 120 at 12; Docket No. 137 at 1-2.  Ameritox then enlisted a national public relations firm to present Nelson's lawsuit (and others it had planted) as legitimate in order to generate negative publicity about Millennium.  That same public relations firm was largely responsible for a November 2012 Reuters article regarding Millennium that featured quotes from Nelson (and other Ameritox surrogates) which Ameritox's sales force then presented to physician customers as accurate "news."  Millennium has good cause to believe (and such persons have not denied) that Ameritox has also funded or encouraged lawsuits filed by several other former employees who were quoted in the Reuters article – as well as competitors litigating with Millennium.  This includes Jodie Strain, Edward Zicari, Lori Martin, Joshua Hugo, Ryan Uehling, and Woburn-based Calloway Labs.

4.      Ameritox has also publicized and disseminated false and misleading information

about an investigation by the United States Attorney's Office in Massachusetts (the "Massachusetts Investigation"), and has repeatedly misrepresented the nature of its own multi-million dollar Medicare fraud settlement. With regard to the Massachusetts Investigation, Ameritox sales representatives have shamelessly attempted to frighten physicians from working with Millennium by publicizing the investigation, while failing to disclose material information, including that Ameritox encouraged the investigation and that Ameritox itself has been subject to extensive federal investigation and oversight, thus creating a false and misleading impression regarding *both* Millennium and Ameritox. Indeed, Ameritox paid $16.3 million to the government to settle claims that it had paid illegal kickbacks to physicians, and as a result of the settlement is currently subject to a five-year Corporate Integrity Agreement. In addition, in just the past three years, Ameritox has been the subject of multiple whistleblower lawsuits alleging a litany of fraudulent sales, marketing and billing practices. Ameritox's conduct with respect to the Massachusetts Investigation is consistent with its pattern and practice of failing to disclose material facts in connection with advertisements about Millennium and about its own compliance program and business practices.

5.     At the same time it has been attacking Millennium, Ameritox has continued to employ unfair and deceptive trade practices designed to maximize its revenues at the expense of Millennium and the public, despite operating under a Corporate Integrity Agreement that was imposed on Ameritox in exchange for settling Medicare fraud allegations. As detailed below, Ameritox's conduct includes, among other things: providing illegal kickbacks to physicians in the form of "specimen processors" that perform administrative tasks for physicians in exchange for referrals, sham "lease" agreements, free or below-market value point-of-care testing ("POCT") cups to be used for billable in-office testing, as well as gift cards, dinners, free

computers, parties and other inducements; promoting medically unnecessary testing by encouraging physicians to base their testing decisions on insurance coverage rather than medical necessity, and requiring physicians to order from an Ameritox-created panel of pre-selected tests rather than offering physicians choice and transparency, as required by CMS's Office of Inspector General ("OIG"); and misleading physicians into believing that it is in-network with various insurance providers when it is not. Ameritox's practices not only harm Millennium, but also place physicians at risk. As one illustration of Ameritox's unlawful practices, Ameritox has provided numerous pain clinics with kickbacks in exchange for business, including Christmas parties, annual "play days," gift cards and meals at high-end restaurants.

6. These allegations are supported by the sworn affidavits of former Ameritox employees attached to this Complaint, who are only some among dozens of former Ameritox employees prepared to come forward to expose Ameritox's unlawful business practices, and mirror in many respects the allegations made in whistleblower lawsuits against Ameritox.

7. For example, a former Ameritox account manager confirms that Ameritox directed specimen processors to perform office duties for physicians, in contravention of law:

> During my employment at Ameritox I was aware that specimen processors performed many office duties they were not allowed to perform. This included filing records, making photocopies of documents, reviewing medical files to retrieve diagnostic information, interpreting and reading POCT test results, selecting diagnostic codes and performing other duties assigned to them by doctor staff. I also knew that specimen processors filed patient requisition forms to the patients medical chart, an activity I knew to be strictly prohibited. I was the primary sales team member in my territory with the responsibility to monitor specimen processor activities. From 2007 to 2010, I specifically recall observing non-approved specimen processor activity.

Exhibit 1 (Feb. 14, 2013 Declaration), ¶ 14. The same account manager also confirms that Ameritox provided free POCT cups to physicians to conduct in-office billable testing:

> I do recall that every POCT test in my territory was sent to an Ameritox lab to confirm the point of care test results obtained at my physician clients office. . . . While at

Ameritox, I was allowed to offer and did offer physician clients free of cost specimen cups.

Id. ¶¶ 11-12.

8.      Although Millennium and Ameritox are engaged in litigation in the Middle District of Florida (Ameritox, Ltd. v. Millennium Laboratories, Inc., Case No. 8:11-cv-00775-SCB-TBM (M.D. Fla.)), this complaint arises from and is based upon facts, events, and transactions and occurrences that are distinct from those in that case. In particular, this complaint is based upon illegal conduct that is not at issue in the Florida litigation or that occurred in states (and in violation of the statutory and common laws of those states) not at issue in the Florida litigation. In addition, many of the facts that are the subject of this complaint occurred more recently than the conduct that is at issue in the Florida litigation.

9.      In particular, as alleged below, Ameritox has engaged and engages in illegal conduct in Massachusetts, Connecticut, Delaware, Maine, Michigan, New Hampshire, New Mexico, Nevada, North Carolina, Ohio and South Carolina. In each of these states, Ameritox has targeted numerous physicians and clinics in an effort to win their business away from Millennium.

10.     As a result of Ameritox's unlawful schemes, Millennium has suffered damages by losing physician relationships and referrals and losing opportunities to win business away from Ameritox, all of which has resulted in continuing irreparable harm to Millennium.

11.     Millennium's claims seek monetary damages and injunctive relief for: (1) violation of the Lanham Act, 15 U.S.C. § 1125(a); (2) violation of the Massachusetts Consumer Protection Act, Mass. Gen. Laws ch. 93A, §§ 1 et seq.; (3) violation of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. §§ 42-110a et seq.; (4) violation of the Delaware Uniform Deceptive Trade Practices Act, Del. Code tit. 6, §§ 2531 et seq.; (5) violation of the Maine

Deceptive Trade Practices Act, 10 Me. Rev. Stat. tit. 10, §§ 1211 et seq.; (6) violation of the New Hampshire Consumer Protection Act, N.H. Rev. Stat. §§ 358-A:1 et seq.; (7) violation of the New Mexico Unfair Trade Practices Act, N.M. Stat. §§ 57-12-1 et seq.; (8) violation of the Nevada Trade Regulation and Practices Act, Nev. Rev. Stat. § 41.600; (9) violation of the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. §§ 75-1 et seq.; (10) violation of the Ohio Deceptive Trade Practices Act, Ohio Rev. Code § 4165 et seq.; (11) violation of the South Carolina Unfair Trade Practices Act, S.C. Code §§ 39-5-10 et seq.; (12) common law unfair competition; and (13) common law tortious interference with business relationships.

## PARTIES

12.     Millennium is a corporation organized and existing under the laws of California, with its principal place of business located at 16891 Via Tazon, San Diego, California. Millennium provides health care providers with medication monitoring services, clinical tools, scientific data and education, helping to personalize treatment plans to improve clinical outcomes and patient safety. Millennium utilizes leading technology and proprietary methodologies to provide some of the fastest and most reliable medication monitoring and drug detective results via both urine drug testing and oral fluid testing. Millennium is registered to do business, and conducts business, in Massachusetts, Connecticut, Delaware, Maine, Michigan, New Hampshire, New Mexico, Nevada, North Carolina, Ohio and South Carolina, among other states.

13.     Ameritox is a limited partnership organized and existing under the laws of Texas with its principal place of business at 300 East Lombard Street, Suite 1610, Baltimore, Maryland. Upon information and belief, Ameritox is owned in part by venture capitalists, including Sterling

Partners, Bain Capital Venture Partners, LLC and Sequoia Capital. Ameritox is a competitor of Millennium in the business of testing specimens and monitoring the results for health care providers who treat and prescribe medications for chronic pain patients. Ameritox conducts business in Massachusetts, Connecticut, Delaware, Maine, Michigan, New Hampshire, New Mexico, Nevada, North Carolina, Ohio and South Carolina, among other states.

## JURISDICTION AND VENUE

14. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because one or more of Millennium's claims arises under federal law.

15. This Court additionally has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because Millennium and Ameritox are citizens of different states and the amount in controversy exceeds $75,000, exclusive of fees and costs.

16. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) and (c)(2) in that a substantial part of the events or omissions giving rise to Millennium's claims for relief occurred in this District and because Ameritox is subject to personal jurisdiction in this District.

## FACTUAL BACKGROUND AND ALLEGATIONS

### I. The Pain Medication Monitoring Industry

17. Millennium and Ameritox are competitors in the clinical testing and drug screening business. Both companies test urine and saliva specimens and monitor results for their respective customers. These tests can measure the presence or quantity of medications in patients' urine specimens, and thereby aid physicians in determining whether their patients are taking prescribed medications, non-prescribed medications, illicit drugs, or not taking their prescribed medications at all. These tests not only assist patient treatment, they also can help address broader societal concerns: abuse, misuse and diversion of prescription pain medications

have become part of a national epidemic.

18.     Since entering the market in 2008, Millennium has become a national leader. Millennium has achieved this distinction by providing superior client service, fast turnaround time, accurate and precise testing results, ethically-based decisions, and continuous education and research to benefit patient care. Millennium strives to offer valuable clinical resources that help personalize treatment plans to improve patient outcomes and safety.

19.     Ameritox also is engaged in the business of performing clinical testing and drug screening. Ameritox conducts business and competes directly with Millennium in Massachusetts, Connecticut, Delaware, Maine, Michigan, New Hampshire, New Mexico, Nevada, North Carolina, Ohio and South Carolina. Millennium's employees and agents and Ameritox's employees and agents regularly compete for the same customers, and make sales visits to the same health care providers' offices, in these states.

20.     Since 2012, Millennium has also conducted pharmacogenetic testing, which is a saliva-based testing method to detect genetic enzymes associated with the metabolism of opiate pain medications. By identifying genetic variations in drug-metabolizing enzymes, physicians can more effectively personalize each patient's treatment. Ameritox entered the pharmacogenetic testing market in or around April 2013, and now competes with Millennium in this market as well. Ameritox uses a third party laboratory, Natural Molecular Testing Corporation, as its reference laboratory for pharmacogenetic testing.

## II.     Ameritox Distributes False And Misleading Information About Millennium And Itself By Failing To Disclose Material Facts

21.     Ameritox has engaged in various conduct disparaging Millennium. Most recently, Ameritox has publicized and disseminated false and misleading information about the Massachusetts Investigation, an investigation that, on information and belief, Ameritox

encouraged the United States Attorney's Office in Boston, Massachusetts to pursue. After encouraging the Massachusetts Investigation, Ameritox then wrongfully sought to publicize it in a false light in an effort to discourage current and potential customers of Millennium from doing business with it, and to instead do business with Ameritox.

22.    In furtherance of its public relations efforts against Millennium, Ameritox has encouraged and funded litigation against the company by former Millennium employees as well as another business competitor, Calloway Labs. Ameritox has also hired a professional public relations firm to manufacture misleading publicity about the Massachusetts Investigation.

23.    Ameritox's efforts to publicly disparage Millennium came to light during discovery in litigation filed against Millennium by its former employee, Kelly Nelson. Nelson sued Millennium in June 2012 in the District of Arizona, asserting a litany of employment-related claims, including retaliation for her complaint about Millennium's allegedly improper business practices. Millennium has learned that Ameritox has a fee arrangement with the law firm representing Nelson in that case whereby Ameritox has been paying her attorneys' fees and expenses since at least May 2012, more than a month <u>before</u> Nelson filed her complaint. In that regard, the Court in Nelson's case remarked in a June 26, 2013 order that "it is now established that Ameritox has been receiving billing statements for Ms. Nelson's legal representation in this action." <u>Nelson v. Millennium Laboratories, Inc.</u>, No. 2:12-cv-01301-SLG (D. Ariz.), Docket No. 185 at 4; <u>see also</u> Docket No. 120 at 12 (ordering Nelson to produce all documents evidencing fee arrangements with Ameritox's attorneys); Docket No. 137 at 1-2 (confirming that Nelson produced documentation regarding her fee arrangement with Ameritox's attorneys and ordering Nelson to also produce billing records for May, June and July 2012). Ameritox and Nelson resisted disclosing evidence of their fee arrangement for over a year before being

compelled by the court to produce it, and they have continued to attempt to conceal their conduct by marking records as highly confidential. Millennium has good cause to believe that Ameritox has funded or encouraged litigation or other action against it by several other former employees, including Jodie Strain, Edward Zicari, Lori Martin, Joshua Hugo, and Ryan Uehling, as well as by another business competitor, Calloway Labs.

24. Not only has Ameritox paid Nelson to prosecute her baseless claims against Millennium, it has also encouraged Nelson to frame her allegations to suit its own needs. In January 2012, Nelson submitted an intake questionnaire and accompanying letter to the EEOC alleging that she was terminated because of her gender and age. Nelson did not assert any alleged retaliation by Millennium. Shortly after Ameritox began paying her attorneys' fees, Nelson filed her complaint against Millennium alleging not only age and gender discrimination, but also asserting for the first time that she was terminated for reporting to her supervisor that Millennium had engaged in improper business practices. Around the same time, Nelson provided Ameritox with two declarations to use in the Florida litigation that made the same allegations against Millennium.

25. In addition to encouraging and funding Nelson's litigation (and tailoring her allegations to suit its own needs), Ameritox also arranged for Nelson to work with a public relations firm based in Massachusetts and Washington, D.C., Conover & Company Communications, Inc. ("Conover") to publicize the Massachusetts Investigation. Nelson's attorney in her action against Millennium produced documents showing that he coordinated with a Conover employee, Gregory Howard, to arrange for her to be interviewed by a Reuters reporter. Howard had extensive communications with the reporter, who subsequently published a story about the investigation that specifically discusses Nelson, her employment at Millennium,

her allegations about Millennium's business practices, the purported reason for her termination, and testimony she provided to the grand jury that (with Ameritox's encouragement) is considering Millennium. Attached as Exhibit 2 is a series of emails from November 2012 evidencing Howard's efforts to arrange for Nelson to speak with the reporter about Millennium. The Reuters article also relied on information from several other people who share two important characteristics with Nelson: they formerly worked at Millennium and were fired for cause, and they are each prosecuting baseless civil lawsuits against Millennium that are being funded by Ameritox. Millennium is informed and believes that Ameritox also funded Conover and Howard's efforts.

26.     Following publication of the Reuters article, which it had manufactured, Ameritox then directed its sales representatives to interfere with Millennium's business relationships with current and potential customers by disseminating the Reuter's article to Millennium's customers and partners, portraying it as an objective report, and embellishing the article with *additional* false and misleading information about the Massachusetts Investigation.

27.     For example, in or around November 2012, Brian Ward, an Ameritox sales representative in Nebraska and Iowa (among other states), visited a Millennium customer located in Iowa and attempted to convince it to stop doing business with Millennium and to refer future business to Ameritox instead. In making his sales pitch, Ward provided Millennium's customer with a copy of the Reuters article as an attachment to a document that mischaracterized the Massachusetts Investigation. See Exhibit 3.

28.     This Ameritox document is false and misleading because it failed to disclose its own role in encouraging the investigation and the article itself, including the quotes attributed to Ameritox-financed surrogates. The document is also false and misleading because Ameritox

failed to disclose that it has itself been investigated by the United States Attorney's Office, and has also been the subject of multiple *qui tam* actions by its former employees alleging that it engaged in illegal conduct. As discussed below, the United States Attorney's Office investigation resulted in Ameritox paying a $16.3 million settlement – the largest in history for a urine drug company. As a condition of the settlement, Ameritox was also required to enter into a five-year Corporate Integrity Agreement ("CIA") with United States government.

29.     On information and belief, Ameritox has widely disseminated statements identical or similar to those contained in the document distributed by Ward to a substantial portion of health care providers in Massachusetts and elsewhere.

30.     Millennium has suffered damages and injury to its reputation and goodwill as a result of Ameritox's false and misleading statements about the Massachusetts Investigation. By failing to disclose its own encouragement of the Massachusetts Investigation and the fact that it has been subject to extensive federal investigation and oversight due to its illegal activities, Ameritox gives physicians the false impression that Millennium has been investigated by the government while it has not and that it is a more ethical and law-abiding company than Millennium. These statements materially influence physicians to choose Ameritox over Millennium because they lead physicians to believe that they will be less likely to become involved in an investigation if they do business with Ameritox.

31.     Ameritox's false and misleading statements about the Massachusetts Investigation are consistent with its pattern and practice of making false and misleading statements about Millennium in the context of publicizing legal proceedings by failing to disclose material facts.

32.     For example, in April 2011, Ameritox's CEO Ancelmo Lopes published a letter circulated by Ameritox's sales representatives to current and potential Millennium customers,

falsely and misleadingly describing a complaint filed against Millennium by Robert Cunningham, a former senior executive of another competitor, Calloway Laboratories, Inc. ("Calloway").  See Exhibit 4.  Cunningham had filed a *qui tam* action against Millennium that was unsealed in March 2011 after the United States stated that it was not intervening in the action.  United States ex. rel.  Cunningham v. Millennium Laboratories, Inc., No. 09-CV-12209 (D. Mass.).

33.     Ameritox's letter was false and misleading because (as it did with respect to the Massachusetts Investigation) Ameritox failed to disclose the fact that Cunningham filed a nearly identical whistleblower complaint against it that the government was still investigating at the time it published and circulated the letter.  Ameritox's letter also was false and misleading because it omitted to state that the United States had declined to intervene in the action against Millennium after having had more than one year to investigate the complaint's allegations.  In addition, Ameritox acted falsely and misleadingly regarding the letter because it never provided any corrective disclosure either after the United States subsequently stated for a second time that it was not intervening in the case against Millennium, or after the complaint was dismissed with prejudice.  Nor did Ameritox ever disclose the circumstances under which Cunningham and/or Calloway agreed to forego their claims against Ameritox and instead collaborate in separate litigation with Millennium.

34.     Similarly, on April 19, 2012, Ameritox issued a press release on its website that mischaracterized its "compliance program" by failing to disclose that this program was the direct result of its settlement with the federal government following an extensive investigation into its illegal business practices.  See Exhibit 5.  The press release also contained a number of other false and misleading statements about Ameritox's business practices.

35.     The following specific statements in the press release, among others, are false and

misleading:

| Statement | Reasons Why It Is False And Misleading |
|---|---|
| "[Ameritox's] long-public national ethical standards and its best-in-class compliance program developed in consultation with the [OIG];" <br> "Ameritox works closely with independent and Federal agencies to review its customer support programs, in a review process that represents an industry best practice;" <br> "Ameritox is the only pain medication monitoring company with a fully implemented, effective compliance program that meets all of the requirements of the [OIG]." | These statements are misleading because Ameritox fails to mention that its "compliance program" is the direct result of its five-year CIA, which (as discussed below) it entered into to settle claims that it engaged in Medicare fraud by providing illegal kickbacks to customers. The statements imply that Ameritox voluntarily cooperated with the OIG to establish a superior compliance program, when in fact Ameritox was compelled by the CIA to establish a compliance program because of its illegal activities. |
| "Ameritox, unlike a San Diego company, does not recommend customers retest negative drug samples much less make it a standing practice to retest all negative drug samples." | This statement is false because Ameritox encourages and regularly performs confirmation testing of negative test results. |
| "Providing gratis or reduced-cost POC cups for physicians to perform billable testing is a questionable practice that Ameritox believes is a violation of anti-kickback laws, therefore putting physician practices at risk." | This statement is false because it implies that Ameritox does not provide gratis or reduced-cost POCT cups for physicians to perform billable testing, when in fact Ameritox regularly engages in such conduct. |
| "Ameritox invests in science that advances patient pain-medication monitoring and not in political campaigns. . . . That said, its San Diego competitor supports state-government legislative efforts and funds those opinions with PAC resources. In Florida alone, where pending key legislation benefits that company, it has targeted $20,000 in contributions." | This statement is false because it implies that Ameritox does not invest in political campaigns or legislative efforts. In fact, Ameritox has retained one of the largest lobbying firms in Washington, D.C. to promote its legislative interests at a rate of $100,000 per quarter. |

36.     The press release was redistributed across the internet by the Associated Press and

has appeared on at least five other news or media outlets, including PR Newswire,

Pharmaceutical GMP, HighBeam Research, BioPortfolio and Maryland Statewatcher.com.  The

distribution of the press release on multiple online outlets has ensured wide viewership by

Millennium's current and potential customers and other physicians.

37.     Although the press release does not refer to Millennium by name, instead

referencing "a San Diego-based drug testing laboratory" and "a San Diego company," the relevant purchasing public, consisting of physicians who administer pain medications, would understand the press release to be referring to Millennium because Millennium is the only San Diego-based laboratory that directly competes with Ameritox. In fact, Millennium is the only significant competitor of Ameritox in the entire region. Millennium will be able to show at trial that the relevant purchasing public would, without question, know that the press release referred to Millennium.

38. By making the foregoing false and misleading statements to physicians choosing between Millennium and Ameritox, Ameritox has won business that otherwise would have been captured by Millennium. Ameritox therefore has obtained profits to which it is not entitled. Further, Millennium has invested substantial resources in developing its reputation and goodwill in the marketplace, and Ameritox has harmed that reputation and goodwill by conveying through its false and misleading statements that its practices and services are superior to Millennium's.

III.  **Ameritox Has A History Of Providing Illegal Kickbacks To Physicians And Continues To Do So**

39. Ameritox has a well-documented history of illegal business practices. These practices were exposed when Debra Maul, a former Ameritox sales representative, filed a complaint under the False Claims Act, 31 U.S.C. § 3729, alleging that Ameritox paid illegal kickbacks to physicians in the form of direct cash payments and free specimen processors in exchange for referrals. Maul's allegations gave rise to an investigation of Ameritox by the United States Attorney's Office for the Middle District of Florida. In 2010, Ameritox settled with the government for $16.3 million, the largest Medicare fraud settlement ever paid to the government by a urine drug testing lab. The settlement required Ameritox to enter into a CIA with the United States government that, among other things, requires Ameritox to establish a

formal compliance program and engage an independent company to review its submissions to federal government health care programs.

40.     A press release issued by the United States Attorney's Office following the settlement confirmed that Ameritox had paid illegal kickbacks to physicians in the form of cash and in-kind services:

> United States Attorney Robert E. O'Neill announced today that Ameritox, Ltd. has agreed to pay $16.3 million in a civil settlement that addresses allegations that it paid kickbacks to providers in order to induce them to refer Medicare business. . . .  The settlement resolves allegations that Ameritox made cash payments to its physicians clients . . . to induce the referral of drug testing services.  It also resolves claims arising from the offer by Ameritox of free collector personnel to its physician clientele . . . in order to induce the referral of Medicare business.

Exhibit 6 (Middle District of Florida United States Attorney's Office Press Release, Nov. 16, 2010).

41.     Despite the prior investigation and the fact that it remains subject to the CIA, Ameritox has continued to offer illegal kickbacks to health care providers in Massachusetts, Connecticut, Delaware, Maine, Michigan, New Hampshire, New Mexico, Nevada, North Carolina, Ohio and South Carolina.  Ameritox offers illegal kickbacks in these states in an effort to win business away from Millennium, as it has been unable to compete with Millennium through lawful means due to Millennium's superior services.  These illegal kickbacks not only harm Millennium by giving Ameritox a competitive advantage, they also place physicians at risk because the Anti-Kickback statute and other anti-kickback laws ascribe liability to parties on both sides of an unlawful kickback transaction.

42.     The OIG explains that kickbacks "result in unfair competition by freezing out competitors who are unwilling to pay kickbacks."  OIG Special Fraud Alert on Rental of Space in Physician Offices by Persons or Entities to Which Physicians Refer (Feb. 2000) (Exhibit 7).

Kickbacks also "distort medical decision-making, cause overutilization, increase costs . . . [and] adversely affect the quality of patient care by encouraging physicians to order services or recommend supplies based on profit rather than the patients' best medical interests." (Id.)

43.     In addition, Ameritox falsely represents to physicians that the illegal kickbacks it offers are legal.  Millennium has invested substantial resources in developing its reputation and goodwill in the marketplace by, among other things, providing education to physicians regarding lawful and ethical sales practices.  By misleading physicians about the legality of its unlawful inducements, Ameritox harms Millennium's reputation and goodwill by implying that it is willing to provide more services to accounts than Millennium.

**A.     Ameritox Provides Illegal Kickbacks To Physicians In The Form Of Improper Specimen Processor Services And Sham "Lease" Agreements**

44.     One way in which Ameritox offers illegal kickbacks to physicians is to place Ameritox-paid employees, known as specimen processors or collectors, in some of their customer's offices at no cost.  These specimen processers obtain urine samples from the physicians and then deliver them to Ameritox for testing.

45.     Ameritox retains these specimen processors through third-party vendors that purportedly employ them.  In reality, however, Ameritox hires the specimen processors, pays their salaries, determines their office placement, job duties and responsibilities, and trains, instructs, supervises, and generally directs their activities.  Therefore, the specimen processors are in effect employees or agents of Ameritox.

46.     The use of specimen processors to collect urine samples is not per se illegal in the states at issue in this case.  However, as practiced, Ameritox's specimen processor program constitutes an illegal kickback scheme.  Specifically, Ameritox requires physicians to agree that

they will meet a quota whereby they submit a minimum number of urine samples to Ameritox as a condition for having a specimen processor placed at their office at no cost.

47.     For example, a former Ameritox account manager in Michigan describes how Ameritox required physicians to provide a certain number of sales for testing as a condition of having a specimen processor assigned to their offices:

> Ameritox also allowed me to offer physician clients free of cost specimen processors. The placement of specimen processors in a physician client office was based on the number of urine samples collected by that physician client and delivered to Ameritox for testing. Specimen processors were offered to Ameritox's largest customers in my territory, as long as they sent their samples in to Ameritox for testing. Sales team members in my territory did make it clear to a customer receiving a free of cost specimen processor what Ameritox's sample expectations were. I know that customers receiving the benefit of a specimen processor were required to provide Ameritox a steady number of urine samples or else the specimen processor would be removed from their practice. In my experience, specimen processors were offered to Ameritox physician clients solely as an inducement to get those physician clients urine specimens.

Exhibit 1 (Feb. 14, 2013 Declaration), ¶ 13.

48.     Ameritox attempts to conceal its improper practice by advising its sales representatives to orally inform physicians of the quota requirement without memorializing it in writing. Ameritox, however, requires sales representatives to complete forms confirming that they communicated the requirements to their customers.

49.     Ameritox's use of specimen processors in the states at issue also constitutes an illegal kickback scheme because Ameritox knowingly allowed, encouraged and directed specimen processors to perform clerical, administrative, and other duties for its physician customers at no expense. These duties include, among other things, reviewing patient charts, answering phone calls, returning patient phone calls, ordering tests and completing paperwork.

50. For example, a former Ameritox specimen collector in Ohio explains that, under the direction and supervision of an Ameritox sales representative, she performed numerous improper duties for the physician to whom she was assigned:

> I was responsible for monitoring patient medical files to ensure that Ameritox tested [the physician's] patients at least once every six (6) weeks. I also was tasked by [the physician] to review patient charts, primarily to determine when a patient last provided a urine sample and the specific medications that patient was taking. In reviewing [the physician's] patient charts, if I determined that a patient had not provided [the physician] with a urine sample in the preceding six (6) weeks, then I was instructed by [the Ameritox sales representative and the physician] to call the patient and schedule an appointment for the specific purpose of securing a urine sample. . . . [The Ameritox sales representative] was well-aware that I reviewed patient medical files and assisted [the physician's] office not only by monitoring patient medical files but also by scheduling appointments. I recall her telling me, "that's fine, keep Dr. Gomaa happy."

Exhibit 8 (Jan. 4, 2013 Declaration), ¶ 5.

51. Likewise, a former Ameritox account manager in Michigan confirms that specimen processors performed office duties for physicians:

> During my employment at Ameritox I was aware that specimen processors performed many office duties they were not allowed to perform. This included filing records, making photocopies of documents, reviewing medical files to retrieve diagnostic information, interpreting and reading POCT test results, selecting diagnostic codes and performing other duties assigned to them by doctor staff. I also knew that specimen processors filed patient requisition forms to the patients medical chart, an activity I knew to be strictly prohibited. I was the primary sales team member in my territory with the responsibility to monitor specimen processor activities. From 2007 to 2010, I specifically recall observing non-approved specimen processor activity.

Exhibit 1 (Feb. 14, 2013 Declaration), ¶ 14.

52. The OIG has stated that where laboratory personnel perform "clerical or medical functions not directly related to the collection and processing of laboratory specimens, a strong inference arises that he or she is providing a benefit in return for the physician's referrals to the laboratory" in violation of the federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b. OIG Special Fraud Alert on Arrangements for the Provision of Clinical Lab Services, 59 Fed. Reg.

65372, 65377 (Dec. 19, 1994) (Exhibit 9).  Such arrangements also constitute unlawful

remuneration under the federal Stark Law, 42 U.S.C. § 1395nn, as well as state anti-kickback

laws.

53.     Ameritox falsely represents to a substantial number of health care providers in the

states at issue that its specimen processor program complies with state and federal law.  These

representations are false and likely to deceive physicians, because as practiced by Ameritox its

specimen processor program constitutes an illegal kickback scheme and/or unlawful

remuneration under the Stark Law.  Ameritox makes these representations with the intent to

induce physicians to refer business to Ameritox.  By providing these illegal kickbacks, Ameritox

places physicians at risk.

54.     Ameritox also attempts to win business away from Millennium in the states at

issue in this case by employing a "space lease" scheme.  Under this scheme, Ameritox leases or

rents a small amount of space inside the offices of certain of its physician-customers, purportedly

for its specimen processors to occupy and use while collecting samples.  Ameritox pays a

monthly rent in exchange for its "use" of the space.  These agreements are conditioned on the

physicians' promises to exclusively use Ameritox for their laboratory testing services.

55.     A former Ameritox account manager confirms this practice, explaining that "I

was aware that during my employment at Ameritox, the company reimbursed physician clients

for space occupied by a specimen processor assigned to a customers' practice."  Exhibit 1 (Feb.

14, 2013 Declaration), ¶ 14.

56.     As practiced, Ameritox's space lease agreements constitute illegal kickbacks and

prohibited remuneration under the Stark Law.  The agreements that Ameritox enters into are not

commercially reasonable and are entered into for the sole purpose of allowing Ameritox to

compete unfairly by providing cash directly to its customers, taking Ameritox's sham lease agreements far outside of any "safe harbor."

57.     Federal regulations promulgated pursuant to the Stark Law create an exception for certain office space lease agreements, provided that they comply with certain conditions.  42 C.F.R. § 411.357(a).  One of those enumerated conditions is that the "agreement would be commercially reasonable even if no referrals were made between the lessee and the lessor."  Id. § 411.357(a)(6).  Ameritox's space leases are not commercially reasonable and would not be entered into absent referrals of testing services by physicians.

58.     In addition, the OIG has promulgated guidance explaining that the "threshold inquiry" in determining whether rental arrangements between physicians and suppliers is "whether payment of rent is appropriate at all."  OIG Special Fraud Alert on Rental of Space in Physician Offices by Persons or Entities to Which Physicians Refer (Feb. 2000) (Exhibit 7).  "Payments of 'rent' for space that traditionally has been provided for free or for a nominal charge as an accommodation between the parties for the benefit of the physicians' patients . . . may be disguised as kickbacks."  (Id.)  The "space" that Ameritox rents from physicians is space that is typically provided for free.  Indeed, Ameritox offers lease agreements only to certain physicians depending on whether additional payment is needed to convince those physicians to use Ameritox for laboratory testing, which underscores the inappropriateness of Ameritox's lease agreements.

59.     The New Jersey United States Attorney's Office recently indicted a physician and the president and two employees of a medical laboratory for participating in a scheme to bribe doctors to refer patient blood samples to the laboratory and to order unnecessary tests.  See Exhibit 10 (New Jersey United States Attorney's Office Press Release, Apr. 9, 2013).  The

scheme, which was similar to the conduct that Ameritox engages in, involved bribes paid to physicians under purported "lease" agreements:

> Numerous physicians were bribed under the guise of lease, service, and/or consulting agreements. Under the lease and service agreements, between 2006 and 2009, physicians were frequently paid thousands of dollars a month by BLS for space in medical offices that BLS did not need or actually use and to perform routine blood drawing services that had little real dollar value.

Id. at 1-2.

60. Millennium has been harmed by Ameritox's practices because they have caused physicians to choose Ameritox over Millennium for laboratory testing services, resulting in Millennium losing business that it otherwise would have retained or won away from Ameritox.

**B. Ameritox Provides Illegal Kickbacks To Physicians In The Form Of Free Or Below Market Value Testing Cups**

61. Another type of illegal kickback that Ameritox offers to physicians in the states at issue in order to win their business away from Millennium are free or below market value "point-of-care" testing cups for use in conducting billable screening tests in-office.

62. A former Ameritox account manager in Michigan, for instance, confirms that he provided free cups to physicians that were used in billable point-of-care testing. See Exhibit 1 (Feb. 14, 2013 Declaration), ¶¶ 11-12 ("I do recall that every POCT test in my territory was sent to an Ameritox lab to confirm the point of care test results obtained at my physician clients office. . . . While at Ameritox, I was allowed to offer and did offer physician clients free of cost specimen cups.").

63. Ameritox's purpose in providing point-of-care testing cups is to allow physicians to bill and receive revenue from insurers, including Medicare, by conducting initial drug screening tests administered in their offices at the time of patients' visits. Ameritox works with third party vendors to supply physicians with point-of-care testing cups and accompanying

testing strips that are used to conduct a billable screening test in-office. Ameritox provides free or below market value testing cups and strips for the purpose of creating a billable testing event for physicians on the condition that physicians refer all confirmatory testing for those screening tests to Ameritox.

64.     Ameritox represents to a substantial number of physicians in the states at issue that its provision of free or below market value point-of-care testing cups and strips to be used for billable in-office testing complies with state and federal law. In fact, this practice constitutes an illegal kickback scheme when the physician bills for and receives revenue from point-of-care testing using the free or below market value cups and strips, as Ameritox encourages physicians to do. By offering these illegal kickbacks, Ameritox places physicians at risk.

65.     Ameritox is well aware that the provision of free or below market value testing cups to physicians to be used to conduct billable screening tests in-office violates the anti-kickback laws. In fact, Ameritox circulated a letter signed by its Compliance Officer to physicians in October 2011 explaining that this practice is illegal and claiming that Ameritox does not engage in it. See Exhibit 11 (Oct. 17, 2011 Letter from Regina G. Morano). This letter is false and misleading because Ameritox regularly provides physicians in the states at issue with free or below market testing cups to be used for billable testing in exchange for referrals.

66.     Millennium has been harmed by Ameritox's unfair practice of providing free or below market point-of-care testing cups and strips to be used for billable in-office testing because it has caused physicians to choose Ameritox over Millennium for laboratory testing services, resulting in Millennium losing business that it otherwise would have retained or won away from Ameritox.

C.       **Ameritox Provides Numerous Other Illegal**
         **Kickbacks To Physicians In Exchange For Referrals**

67.     Ameritox provides a number of other types of illegal kickbacks to physicians and

their staff in an effort to win business away from Millennium.  These kickbacks include, but are

not limited to, handing out free gift cards; sponsoring and paying for dinners, office parties and

other events; providing free computers for use in physicians' offices; arranging for the sale of

non-Ameritox products at reduced prices; and contracting with a third party vendor (Natural

Molecular Testing Corporation) that provides pharmacogenetic testing and that itself provides

improper kickbacks or benefits to physicians.  Ameritox then relies on these inducements to

obtain physicians' drug testing business.

68.     For example, Ameritox has provided numerous pain clinics with kickbacks in

exchange for business, including Christmas parties, annual "play days," gift cards and meals at

high-end restaurants.

69.     Ameritox management, while officially adopting a policy that limits the amount

that its sales representatives can spend on gift cards and meals for physicians, is aware of and

encourages its sales representatives to provide these kickbacks at their own expense.  This allows

Ameritox to "report" compliance under the annual Stark law limits and also the terms of its CIA,

even when it knows those representations to be false.  Ameritox management is also aware that

sales representatives regularly recoup these expenses by artificially inflating their mileage

reimbursements.

70.     Further, Ameritox recently entered into an exclusive relationship with Natural

Molecular Testing ("Natural Molecular"), a genomics laboratory, to offer pharmacogenetic

testing to physicians in order to compete with pharmacogenetic testing services offered by

Millennium.

71.     Pharmacogenetic testing is a saliva-based testing method to detect genetic
enzymes associated with the metabolism of medications commonly prescribed to patients
suffering from chronic pain.  By identifying genetic variations in drug-metabolizing enzymes,
physicians can more effectively personalize each patient's treatment.

72.     Through collaboration with Ameritox, Natural Molecular has attempted to take
market share in the pain and addiction markets by offering payment arrangements with
physicians.  For instance, Natural Molecular offers physicians $95 per patient for enrolling
patients in a "registry study" called the "PRIDE Registry," that is, upon information and belief, a
sham designed to provide payments to physicians in exchange for referrals.  Natural Molecular
requires physicians to use its pharmacogenetic testing services for 30 days and 100 patients
before they are eligible to begin enrolling patients and receiving payments.  Natural Molecular
informs physicians that after meeting this referral threshold, there is no limit to the number of
patients they can enroll and that the registry is expected to be open for four years.  National
Molecular sales representatives have also informed physicians that these payments are intended
to replace the loss of Medicare reimbursement for performing an oral swab for pharmacogenetic
testing and that the process "takes about 20 seconds to complete."  In addition, Natural
Molecular enters into "Laboratory Service Agreements" with physicians pursuant to which it
pays physicians $15 per referred test for specimen collection and processing services.

73.     Natural Molecular's model of using sham "studies" and specimen collection
payments to market its pharmacogenetic testing services and solicit business from physicians
violates anti-kickback laws and also constitute unlawful remuneration under the Stark Law,
because these payments are made in exchange for referrals and greatly exceed fair market value
compensation for an oral swab that is completed in "about 20 seconds."  In a 2005 advisory

opinion, the OIG indicated that where a clinical lab was paying referring physicians more than the $3 fee per specimen that Medicare pays for the collection and processing of blood samples, "an inference arises that the compensation is paid as an inducement to the physician to refer patients to the laboratory[.]"  OIG Advisory Opinion No. 05-08 (June 13, 2005) (Exhibit 12).

74.      Indeed, Natural Molecular has recently come under the scrutiny of the Center for Medicare and Medicaid Services ("CMS").  In May 2013, Natural Molecular distributed a letter to its customers describing an inquiry by CMS and "observations" that resulted in Natural Molecular being unable to bill Medicare.

75.      Millennium expended substantial resources developing a pharmacogenetic testing laboratory focused on detecting drug-metabolizing enzymes for commonly prescribed opiate pain medications.  By offering illegal payments in the form of sham "studies" and specimen collection payments, Natural Molecular has won business that otherwise would have been captured by Millennium.

76.      As a result of its exclusive relationship with Natural Molecular, Ameritox has been benefitted by the unlawful kickbacks and inducements that Natural Molecular provides to physicians, because Ameritox has received referrals for pharmacogenetic testing that it otherwise would not have received.

## IV.      Ameritox Encourages Medically Unnecessary Testing

77.      Ameritox management encourages and directs its sales representatives in the states at issue to promote medically unnecessary testing in order to maximize its revenues and those of its venture capital owners.  Ameritox's business model, which is premised on testing on the basis of insurance coverage and aggressively pushing an excessive number and frequency of drug tests, violates the requirement that health care services only be "provided economically and only when, and to the extent, medically necessary."  See 42 U.S.C. § 1320c-5(a)(1).

78.     By encouraging physicians to test patients based upon factors other than medical necessity, such as insurance coverage, Ameritox has deceived these physicians into believing that it is appropriate to make treatment decisions based on factors other than their patients' best medical interests. Physicians are placed at risk by Ameritox's efforts to encourage them to conduct medically unnecessary testing.

79.     Millennium has been harmed by Ameritox's practice of encouraging medically unnecessary testing because it has caused physicians to choose Ameritox over Millennium for laboratory testing services, resulting in Millennium losing business that it otherwise would have retained or won away from Ameritox. Physicians are persuaded to choose Ameritox over Millennium because, by testing at a higher frequency than is medically necessary, they are able to bill and collect additional payments for patient office visits as well as point-of-care testing. Further, Millennium is harmed because Ameritox's practice of encouraging medically unnecessary testing allows it to improperly generate greater revenue that it otherwise would, and Ameritox uses this ill-gotten revenue to compete unfairly with Millennium by, among other things, marketing its services using false and misleading representations, compensating its sales representatives for improper conduct, and providing unlawful inducements to physicians.

80.     Ameritox's practices harm not only Millennium but also Medicare and other insurance payers, who are required to reimburse Ameritox and its physician-customers for drug testing that is not medically necessary and not in the best interests of patients. These practices also place physicians at risk.

**A.     Ameritox Encourages Physicians To Base Their Testing
        Decisions On Insurance Coverage Rather Than Medical Necessity**

81.     Ameritox incentivizes its sales force to encourage physicians to make testing decisions on the basis of their patients insurance coverage, rather than medical necessity. For

example, sales representatives are compensated based on the number of samples physicians send to Ameritox from payers, like Medicare, that reimburse for laboratory testing. On the other hand, sales representatives are not compensated for samples from patients who do not have insurance coverage or have insurance from payers, like Medicaid, who do not reimburse (or reimburse at low rates) for laboratory testing. This incentive structure benefits Ameritox at the expense of patient care, as patients receive different levels of treatment based on the insurance they have rather than their medical needs.

82. In the same vein, Ameritox trains its employees to identify patients covered by Medicare, which reimburses for laboratory testing, and to encourage the physicians they work with to test patients covered by Medicare more frequently than others, regardless of their medical needs.

83. By contrast, Ameritox trains its sales representatives to discourage testing for patients covered by Medicaid, regardless of their medical needs, because Medicaid, depending on the state at issue, either does not reimburse for testing or reimburses at low rates. Ameritox reinforces this training by refusing to compensate its sales representatives for samples collected from patients covered by Medicaid.

84. Ameritox also offers physicians benefits, such as waiving co-pays on private insurance testing for their patients, but only if the physicians agree to provide a higher percentage of tests from patients on Medicare.

85. Ameritox's policy of encouraging frequent testing for Medicare patients, but discouraging testing when the patient's coverage does not allow for reimbursement is based solely on revenue concerns, has nothing to with patients' medical needs, and results in inconsistent and potentially harmful patient care.

86.     By representing to health care providers that testing should be based on the type of insurance that a patient has, Ameritox deceives physicians into believing that it is appropriate to make treatment decisions based on patients' insurance coverage rather than their best medical interests, in violation of the requirement that health care services be only when "medically necessary." 42 U.S.C. § 1320c-5(a)(1). Physicians are placed at risk by Ameritox's efforts to encourage them to conduct medically unnecessary testing.

**B.      Ameritox Improperly Restricts Physician
         Choice And Information In Its Test Ordering Process**

87.     It is among the first principles of health care that treating physicians must decide what tests or services are medically necessary for the diagnosis and treatment of their patients. Through the 1990s, in a series of civil and criminal enforcement actions that became known as "Labscam," the federal government pursued cases against a number of clinical laboratories that undermined this essential tenet of the health care system by, among other things, creating test panels that deceived physicians into ordering more lab tests than were reasonable and necessary, and by submitting claims for this excessive testing to federal health care programs, including Medicare and Medicaid.

88.     In response to these cases, in 1998 the OIG issued guidance advising clinical laboratories that they "should take all reasonable steps to ensure that [they are] not submitting claims for services that are not covered, reasonable and necessary." See Publication of OIG Compliance Program Guidance for Clinical Laboratories, 63 Fed. Reg. 45076, 45079 (Aug. 24, 1998) (Exhibit 13). Among the specific measures the OIG suggested is that laboratories should construct their test ordering forms to "promote the conscious ordering of tests by physicians" and to ensure that physicians make "an independent medical necessity decision with regard to each test the laboratory will bill." (Id.)

89.     While some companies, including Millennium, use test ordering forms and procedures that adhere to these important principles, Ameritox has sought and obtained an unfair competitive advantage through the use of test ordering forms that deny physicians choice and essential information in the ordering of laboratory drug tests for their patients.  This deceptive practice not only violates various laws of the states at issue in this case, but also causes patients, health care insurers and government programs to pay for testing that physicians do not want or need in the treatment of their patients, thus wasting precious health care resources.

90.     In particular, Ameritox's Recurring Order form significantly restricts the ability of physicians to decide for themselves which drugs should be tested for their patients.  See Exhibit 14 (Ameritox Recurring Order Form).  Instead, Ameritox offers on its order form only a choice of standard panels containing multiple drugs and drugs classes pre-selected by the laboratory. (Id.)  Tests cannot be ordered individually on the Ameritox form.  This practice limits physician choice and encourages excessive and unnecessary testing.  Even if a physician determines that it is medically necessary to test only certain drugs, Ameritox's Recurring Order form requires all of the drugs or drug classes in the "panels" it has created to be tested and paid for.  Moreover, certain of Ameritox's panels were deliberately structured and are promoted to maximize third party payer reimbursement, without regard to relevant clinical considerations.

91.     In addition, with regard to Ameritox's "Integrated Monitoring Panels," which refers to confirmatory testing performed after physicians conduct an initial drug screen in their offices (commonly referred to as "point-of-care" testing), the Ameritox Recurring Order form states that "[e]ach Integrated Monitoring specimen will be tested for all of the drugs, including metabolites, on the selected panel, *regardless of the result of the Point of Care Test*."  (Id.)

(emphasis added).  Thus, for example, physicians who may want to confirm only positive point-of-care results are denied that option by Ameritox.

92.     The Ameritox order forms also are completely devoid of any information on how ordered tests are billed to patients, insurers and government health care programs.  On information and belief, a number of the individual drug classes listed in the Ameritox panels (e.g., opiates) result in patients and payers being billed for testing on multiple drugs and metabolites within the class (e.g., the opiates drug class includes testing for codeine, morphine, hydrocodone/norhydrocodone and hydromorphine).  Thus, physicians ordering testing from Ameritox are not informed that patients and payers will be billed for more individual tests than are indicated on the Ameritox order forms.  Such information is important to, as the OIG suggests, "promote the conscious ordering of tests by physicians," yet is denied to physicians by Ameritox.

93.     Moreover, the Ameritox Recurring Order form further denies physicians the choice of whether specimen validity testing is necessary for individual patients.  Specimen validity testing includes pH, specific gravity and creatinine tests, which are used to assess whether a urine specimen may have been tampered with or whether a patient may have taken certain actions to try to "best the test."  Such testing is pre-marked on the Ameritox form with a note indicating "this test must be done on all specimens."  Exhibit 14.  In Millennium's experience, however, physicians do not always consider specimen validity testing to be necessary for all of their patients.  Thus, again, the Ameritox order form results in testing that physicians may not want or need.

94.     Further, contrary to the OIG's guidance, Ameritox's patient requisition forms – which accompany the specimen at the time of testing – are deliberately designed to prevent

physicians from deviating from its arbitrary panels.  See Exhibit 15 (Ameritox Requisition

Form).  More specifically, on the Ameritox requisition forms, physicians may change their

selection of tests for a specific patient sample only by selecting a different panel or by selecting

"add-on" tests to be conducted in addition to the tests listed in the selected panel.  (Id.)  The

requisition forms do not contain an option for physicians to specifically tailor the tests they order

for their patients based on patient need, and thus they promote medically unnecessary testing and

place physicians at risk of submitting false claims to Medicare and other government payers.

Like the Recurring Order form, the Ameritox requisition forms also contain no information on

how the tests are billed.

   95. A former Ameritox account manager in Michigan describes Ameritox's efforts to

maximize revenue and profits at the expense of basing testing decisions on medical necessity by

using testing "panels" as well as "add-ons" to patient requisition forms:

> I recall Ameritox promoting an initiative directed to its sales team members wherein
> Ameritox wanted its sales team members to promote not only the broadest range of
> testing, but to also include add-ons to patient requisition forms, which served the purpose
> of increasing Ameritox revenues and maximizing company profits.  In my experience,
> panels 9 and 11, as well as add-ons, were encouraged by Ameritox more to enhance
> company revenues and profits than for medical necessity reasons.  Because panel 11
> tested for far more drugs than most patients were prescribed, selecting this panel of tests
> served the corporate goal of enhancing corporate profits more than fulfilling any medical
> necessity.  My compensation was based on the number of sales my physician clients
> directed to Ameritox.

Exhibit 1 (Feb. 14, 2013 Declaration), ¶ 7.

**V. Ameritox Falsely Represents To Physicians That It Is
  In-Network With Insurance Providers When It Is Not**

   96. Ameritox also intentionally misleads physicians regarding the "in-network" status

of insurance providers.  Specifically, Ameritox provides physicians with a list of "Ameritox

Contracted Payors" that it claims are in-network, when in fact a substantial percentage of them are not in-network.

97.     Furthermore, Ameritox intentionally fails to inform its sales representatives when it loses a network contract with an insurance provider.  Instead, Ameritox refuses to provide its representatives with an up-to-date list of in-network insurance providers and encourages them to simply continue selling to physicians if they request one.

98.     Ameritox's practices are designed to induce physicians to select Ameritox over Millennium for laboratory testing services.  In-network insurance status is an important factor for physicians in selecting a laboratory for drug testing services.  Both physicians and their patients benefit from choosing an in-network insurance provider – patients are not billed directly for testing services, and physicians are therefore able to attract more patients and also to collect from insurance providers for point-of-care testing.

99.     Ameritox disseminates its false and misleading representations regarding the in-network status of insurance providers, including inaccurate lists of "Ameritox Contracted Payors," to a substantial number of physicians in the states at issue.

100.    As a result of Ameritox's policy of misrepresenting the in-network status of insurance providers, Ameritox receives referrals for testing it would not otherwise receive. Millennium is harmed by this practice because Millennium is not able to realize the benefit of the "in-network" status it has obtained with insurers who are not under contract with Ameritox.

VI.     **Millennium Has Been And Will Continue
        To Be Harmed By Ameritox's Illegal Actions**

101.    Ameritox knowingly uses its medically unnecessary testing, unlawful specimen processor program, sham space lease agreements, illegal kickbacks, false and misleading representations, and the other unfair and deceptive practices described above, as tools to compete

unfairly and to win business away from Millennium. Ameritox offers improper financial incentives knowing that its services are reimbursed by Medicare, Medicaid, and other government and private payers.

102.     Ameritox's illegal actions constitute unfair competition as well as false advertising and have damaged Millennium by causing it to lose existing customers and to fail to gain new customers it otherwise would have gained but for Ameritox's unfair competition and illegal kickbacks. Physicians are also placed at risk by Ameritox's illegal kickbacks and efforts to encourage medically unnecessary testing.

103.     Ameritox offers inferior testing and other services and generally cannot compete lab-to-lab with Millennium. Ameritox thus tries to induce physicians to use its services by offering them illegal financial incentives as opposed to offering them a better lab to treat their patients. Not only are Ameritox's actions illegal and contrary to its CIA, they also can jeopardize patient safety and quality of care.

104.     As a result of Ameritox's illegal actions and false advertising, Ameritox unfairly and unlawfully has received referrals for urine drug testing that it otherwise would not have received, and has diverted business away from Millennium. Ameritox's conduct has also harmed Millennium's reputation and goodwill in the marketplace, because Ameritox falsely represents that its unlawful inducements are in fact legal and implies that it is willing to provide more services to accounts than Millennium.

105.     Ameritox's actions have been deliberate, willful, and wanton, and taken with full knowledge that its conduct constitutes unlawful and unfair business practices. Ameritox is engaged in these activities in Massachusetts, Connecticut, Delaware, Maine, Michigan, New Hampshire, New Mexico, Nevada, North Carolina, Ohio and South Carolina.

106.    Millennium has no adequate remedy at law for the continuing irreparable harm
caused by Ameritox.  Millennium has suffered, and will continue to suffer, damages in the form
of lost business opportunities because of Ameritox's willingness to engage in illegal and unfair
activities as well as false advertising.

**FIRST CAUSE OF ACTION**
**(Violation of the Lanham Act, 15 U.S.C. § 1125(a) – Injunctive Relief and Damages)**

107.    Millennium repeats and re-alleges all of the allegations contained in the foregoing
paragraphs as if fully set forth herein.

108.    Ameritox and its representatives and agents have, as alleged above, made false
and misleading statements in connection with commercial advertising and promotion in violation
of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

109.    Ameritox's statements are literally false and/or likely to deceive a substantial
portion of the relevant purchasing public, consisting of health care providers throughout the
country, about the true nature, characteristics, and qualities of its and Millennium's services.

110.    The relevant purchasing public consists of health care providers who are
customers and prospective customers of Millennium and Ameritox.  Millennium and Ameritox
are in direct competition throughout the country for the same customers, and their products travel
in interstate commerce.

111.    Ameritox has widely disseminated its false and misleading representations about
the Massachusetts Investigation and other matters to a substantial portion of health care
providers in Massachusetts and elsewhere.  As detailed above, Ameritox's representations about
the Massachusetts Investigation are false and misleading because Ameritox fails to disclose its
own encouragement of the investigation and the fact that it has been subject to extensive federal
investigation and oversight due to its illegal activities.  Health care providers have been

35

materially influenced by these representations to choose Ameritox over Millennium for laboratory testing services, because they have been caused to believe that they will be less likely to become involved in an investigation if they do business with Ameritox.  Further, Ameritox's false and misleading statements about the Massachusetts Investigation have injured Millennium's reputation and goodwill, which it has spent substantial resources developing.

112.    Ameritox has also widely disseminated the false and misleading representations contained in its April 19, 2012 press release to a substantial portion of health care providers in Massachusetts and throughout the country.  By making these false and misleading statements, Ameritox has materially influenced health care providers to choose it over Millennium for laboratory testing services.  Further, Ameritox has harmed Millennium's reputation and goodwill by conveying through its false and misleading statements that its practices and services are superior to Millennium's.

113.    Ameritox's false and misleading representations have, and will likely continue to have, a material adverse effect on Millennium because they have resulted in the loss of current and prospective customers who, but for Ameritox's representations, would have done business with Millennium instead due to Millennium's superior services.

114.    As a proximate cause of Ameritox's false and misleading commercial advertising, Millennium has suffered damages and injury to its reputation and goodwill, and is entitled to all remedies available under the law as set forth in its Prayer for Relief below.

**SECOND CAUSE OF ACTION**
**(Violation of the Massachusetts Consumer Protection Act,**
**Mass. Gen. Laws ch. 93A, §§ 1 et seq. – Injunctive Relief and Damages)**

115.    Millennium repeats and re-alleges all of the allegations contained in the foregoing paragraphs as if fully set forth herein.

116.     Ameritox, through its actions, as described above, has engaged in numerous deceptive acts and unfair practices in Massachusetts by knowingly offering and providing kickbacks and other improper financial inducements to physician-consumers in exchange for the referral of business, in violation of federal and Massachusetts law as well as the CIA.

117.     Ameritox's deceptive acts and unfair practices include, among other things:

(a)      providing physicians with free specimen processors under the condition that they submit a minimum number of urine samples for confirmatory testing;

(b)      directing specimen processors to perform clerical, administrative and other duties for physicians at no expense;

(c)      entering into lease agreements with physicians that are commercially unreasonable and involve the rental of space that is typically provided for free;

(d)      providing physicians with point-of-care testing cups and strips for free or below market value to generate extra revenue for physicians who use those cups to perform billable testing;

(e)      offering kickbacks to physicians in the form of free gift cards, dinners, office parties and other events, computers, and discounted non-Ameritox products;

(f)      misleading physicians into ordering medically unnecessary testing by, among other things, encouraging them to order tests on the basis of patients' insurance coverage rather than their medical needs, and requiring

them to order from an Ameritox-created panel of pre-selected tests rather

than offering choice and transparency;

(g)     falsely representing to physicians that it is "in-network" with insurance

providers when it is not; and

(h)     distributing false and misleading information about the Massachusetts

Investigation and about its own compliance program and business

practices to physicians.

118.     Ameritox's deceptive acts and unfair practices have influenced, and will continue

to influence, customer purchasing decisions because they cause physicians to choose Ameritox's

services instead of those offered by Millennium.

119.     Ameritox, directly and through its agents, engages in this conduct in

Massachusetts in order to retain a benefit for its dishonest conduct and to unfairly disrupt

Millennium's business practices within the same market.  Ameritox's conduct constitutes unfair

methods of competition and unfair and deceptive acts or practices under Mass. Gen. Laws ch.

93A, § 2.  Ameritox's unfair and deceptive acts and practices have occurred primarily and

substantially in Massachusetts.

120.     Ameritox engaged in the foregoing unfair and deceptive acts and practices

knowingly and intentionally.  Millennium has been harmed by the wrongful and intentional

actions of Ameritox and is entitled to all remedies available under the law as set forth in its

Prayer for Relief below.

## THIRD CAUSE OF ACTION
### (Violation of the Connecticut Unfair Trade Practices Act,
### Conn. Gen. Stat. §§ 42-110a et seq. – Injunctive Relief and Damages)

121.     Millennium repeats and re-alleges all of the allegations contained in the foregoing

paragraphs as if fully set forth herein.

122.     Ameritox, through its actions, as described above, has engaged in numerous deceptive acts and unfair practices in Connecticut by knowingly offering and providing kickbacks and other improper financial inducements to physician-consumers in exchange for the referral of business, in violation of federal and Connecticut law as well as the CIA.

123.     Ameritox's deceptive acts and unfair practices include, among other things:

(a)     providing physicians with free specimen processors under the condition that they submit a minimum number of urine samples for confirmatory testing;

(b)     directing specimen processors to perform clerical, administrative and other duties for physicians at no expense;

(c)     entering into lease agreements with physicians that are commercially unreasonable and involve the rental of space that is typically provided for free;

(d)     providing physicians with point-of-care testing cups and strips for free or below market value to generate extra revenue for physicians who use those cups to perform billable testing;

(e)     offering kickbacks to physicians in the form of free gift cards, dinners, office parties and other events, computers, and discounted non-Ameritox products;

(f)     misleading physicians into ordering medically unnecessary testing by, among other things, encouraging them to order tests on the basis of patients' insurance coverage rather than their medical needs, and requiring

them to order from an Ameritox-created panel of pre-selected tests rather than offering choice and transparency;

(g)     falsely representing to physicians that it is "in-network" with insurance providers when it is not; and

(h)     distributing false and misleading information about the Massachusetts Investigation and about its own compliance program and business practices to physicians.

124.     Ameritox's deceptive acts and unfair practices have influenced, and will continue to influence, customer purchasing decisions because they cause physicians to choose Ameritox's services instead of those offered by Millennium.

125.     Ameritox, directly and through its agents, engages in this conduct in Connecticut in order to retain a benefit for its dishonest conduct and to unfairly disrupt Millennium's business practices within the same market.  Ameritox's conduct constitutes unfair methods of competition and unfair and deceptive acts or practices under Section 42b-110b, Connecticut General Statutes.

126.     Ameritox's conduct is intentional and wanton and demonstrates a reckless indifference to both the rights of health care providers and the rights of Millennium.

127.     Millennium has been harmed by the wrongful and intentional actions of Ameritox and is entitled to all remedies available under the law as set forth in its Prayer for Relief below.

**FOURTH CAUSE OF ACTION**
**(Violation of the Delaware Uniform Deceptive Trade Practices**
**Act, Del. Code tit. 6, §§ 2531 et seq. – Injunctive Relief and Damages)**

128.     Millennium repeats and re-alleges all of the allegations contained in the foregoing paragraphs as if fully set forth herein.

129.     Ameritox, through its actions, as described above, has engaged in numerous deceptive acts and practices in Delaware by knowingly offering and providing kickbacks and

other improper financial inducements to physician-consumers in exchange for the referral of business, in violation of federal and Delaware law as well as the CIA.

130.     Ameritox's deceptive acts and practices include, among other things:

(a)     falsely representing that its specimen processor program and space lease agreements are legal when, as practiced by Ameritox, they constitute an illegal kickback scheme and/or unlawful remuneration;

(b)     misleading physicians into ordering medically unnecessary testing by, among other things, encouraging them to order tests on the basis of patients' insurance coverage rather than their medical needs, and requiring them to order from an Ameritox-created panel of pre-selected tests rather than offering choice and transparency;

(c)     falsely representing to physicians that it is "in-network" with insurance providers when it is not; and

(d)     distributing false and misleading information about the Massachusetts Investigation and about its own compliance program and business practices to physicians.

131.     Ameritox's deceptive acts and practices have influenced, and will continue to influence, customer purchasing decisions because they cause physicians to choose Ameritox's services instead of those offered by Millennium.

132.     Ameritox, directly and through its agents, engages in this conduct in Delaware in order to retain a benefit for its dishonest conduct and to unfairly disrupt Millennium's business practices within the same market.  Ameritox's conduct constitutes deceptive acts or practices

under Del. Code tit. 6, § 2532, because Ameritox has engaged in conduct that creates a likelihood of confusion or misunderstanding among health care providers.

133.    Ameritox engaged in the foregoing deceptive trade practices intentionally and willfully, because Ameritox knew or should have known that its conduct violated Delaware law.

134.    Millennium has been harmed by the wrongful and intentional actions of Ameritox, and is entitled to all remedies available under the law as set forth in its Prayer for Relief below.

**FIFTH CAUSE OF ACTION**
**(Violation of the Maine Deceptive Trade Practices**
**Act, 10 Me. Rev. Stat. tit. 10, §§ 1211 et seq. – Injunctive Relief)**

135.    Millennium repeats and re-alleges all of the allegations contained in the foregoing paragraphs as if fully set forth herein.

136.    Ameritox, through its actions, as described above, has engaged in numerous deceptive acts and practices in Maine by knowingly offering and providing kickbacks and other improper financial inducements to physician-consumers in exchange for the referral of business, in violation of federal and Maine law as well as the CIA.

137.    Ameritox's deceptive acts and practices include, among other things:

(a)    falsely representing that its specimen processor program and space lease agreements are legal when, as practiced by Ameritox, they constitute an illegal kickback scheme and/or unlawful remuneration;

(b)    misleading physicians into ordering medically unnecessary testing by, among other things, encouraging them to order tests on the basis of patients' insurance coverage rather than their medical needs, and requiring them to order from an Ameritox-created panel of pre-selected tests rather than offering choice and transparency;

(c)     falsely representing to physicians that it is "in-network" with insurance providers when it is not; and

(d)     distributing false and misleading information about the Massachusetts Investigation and about its own compliance program and business practices to physicians.

138.     Ameritox's deceptive acts and practices have influenced, and will continue to influence, customer purchasing decisions because they cause physicians to choose Ameritox's services instead of those offered by Millennium.

139.     Ameritox, directly and through its agents, engages in this conduct in Maine in order to retain a benefit for its dishonest conduct and to unfairly disrupt Millennium's business practices within the same market.  Ameritox's conduct constitutes deceptive trade practices under Me. Rev. Stat. tit. 10, § 1212, because Ameritox has engaged in conduct that creates a likelihood of confusion or misunderstanding among health care providers.

140.     Ameritox engaged in the foregoing deceptive trade practices intentionally and willfully.

141.     Millennium has been harmed by the wrongful and intentional actions of Ameritox, and is entitled to all remedies available under the law as set forth in its Prayer for Relief below.

**SIXTH CAUSE OF ACTION**
**(Violation of the New Hampshire Consumer Protection Act,**
**N.H. Rev. Stat. §§ 358-A:1 et seq. – Injunctive Relief and Damages)**

142.     Millennium repeats and re-alleges all of the allegations contained in the foregoing paragraphs as if fully set forth herein.

143.     Ameritox, through its actions, as described above, has engaged in numerous deceptive acts and unfair practices in New Hampshire by knowingly offering and providing

kickbacks and other improper financial inducements to physician-consumers in exchange for the referral of business, in violation of federal and New Hampshire law as well as the CIA.

144.     Ameritox's deceptive acts and unfair practices include, among other things:

(a)     providing physicians with free specimen processors under the condition that they submit a minimum number of urine samples for confirmatory testing;

(b)     directing specimen processors to perform clerical, administrative and other duties for physicians at no expense;

(c)     entering into lease agreements with physicians that are commercially unreasonable and involve the rental of space that is typically provided for free;

(d)     providing physicians with point-of-care testing cups and strips for free or below market value to generate extra revenue for physicians who use those cups to perform billable testing;

(e)     offering kickbacks to physicians in the form of free gift cards, dinners, office parties and other events, computers, and discounted non-Ameritox products;

(f)     misleading physicians into ordering medically unnecessary testing by, among other things, encouraging them to order tests on the basis of patients' insurance coverage rather than their medical needs, and requiring them to order from an Ameritox-created panel of pre-selected tests rather than offering choice and transparency;

(g)    falsely representing to physicians that it is "in-network" with insurance providers when it is not; and

(h)    distributing false and misleading information about the Massachusetts Investigation and about its own compliance program and business practices to physicians.

145.    Ameritox's deceptive acts and unfair practices have influenced, and will continue to influence, customer purchasing decisions because they cause physicians to choose Ameritox's services instead of those offered by Millennium.

146.    Ameritox, directly and through its agents, engages in this conduct in New Hampshire in order to retain a benefit for its dishonest conduct and to unfairly disrupt Millennium's business practices within the same market.  Ameritox's conduct constitutes unfair methods of competition and unfair and deceptive acts or practices under N.H. Rev. Stat. § 358-A:2.

147.    Ameritox engaged in the foregoing unfair and deceptive acts and practices willfully and knowingly.

148.    Millennium has been harmed by the wrongful and intentional actions of Ameritox and is entitled to all remedies available under the law as set forth in its Prayer for Relief below.

**SEVENTH CAUSE OF ACTION**
**(Violation of the New Mexico Unfair Trade Practices Act,**
**N.M. Stat. §§ 57-12-1 et seq. – Injunctive Relief and Damages)**

149.    Millennium repeats and re-alleges all of the allegations contained in the foregoing paragraphs as if fully set forth herein.

150.    Ameritox, through its actions, as described above, has engaged in numerous deceptive acts and unfair practices in New Mexico by knowingly offering and providing

kickbacks and other improper financial inducements to physician-consumers in exchange for the referral of business, in violation of federal and New Mexico law as well as the CIA.

151.    Ameritox's deceptive acts and unfair practices include, among other things:

(a)    providing physicians with free specimen processors under the condition that they submit a minimum number of urine samples for confirmatory testing;

(b)    directing specimen processors to perform clerical, administrative and other duties for physicians at no expense;

(c)    entering into lease agreements with physicians that are commercially unreasonable and involve the rental of space that is typically provided for free;

(d)    providing physicians with point-of-care testing cups and strips for free or below market value to generate extra revenue for physicians who use those cups to perform billable testing;

(e)    offering kickbacks to physicians in the form of free gift cards, dinners, office parties and other events, computers, and discounted non-Ameritox products;

(f)    misleading physicians into ordering medically unnecessary testing by, among other things, encouraging them to order tests on the basis of patients' insurance coverage rather than their medical needs, and requiring them to order from an Ameritox-created panel of pre-selected tests rather than offering choice and transparency;

(g)     falsely representing to physicians that it is "in-network" with insurance providers when it is not; and

(h)     distributing false and misleading information about the Massachusetts Investigation and about its own compliance program and business practices to physicians.

152.     Ameritox's deceptive acts and unfair practices have influenced, and will continue to influence, customer purchasing decisions because they cause physicians to choose Ameritox's services instead of those offered by Millennium.

153.     Ameritox, directly and through its agents, engages in this conduct in New Mexico in order to retain a benefit for its dishonest conduct and to unfairly disrupt Millennium's business practices within the same market. Ameritox's conduct constitutes unfair and deceptive trade practices under N.M. Stat. § 57-12-3.

154.     Ameritox engaged in the foregoing unfair and deceptive acts and practices intentionally and willfully.

155.     Millennium has been harmed by the wrongful and intentional actions of Ameritox and is entitled to all remedies available under the law as set forth in its Prayer for Relief below.

**EIGHTH CAUSE OF ACTION**
**(Violation of the Nevada Trade Regulation and Practices**
**Act, Nev. Rev. Stat. § 41.600 – Injunctive Relief and Damages)**

156.     Millennium repeats and re-alleges all of the allegations contained in the foregoing paragraphs as if fully set forth herein.

157.     Ameritox, through its actions, as described above, has engaged in numerous deceptive acts and practices in Nevada by knowingly offering and providing kickbacks and other improper financial inducements to physician-consumers in exchange for the referral of business, in violation of federal and Nevada law as well as the CIA.

158.    Ameritox's deceptive acts and practices include, among other things:

(a)    falsely representing that its specimen processor program and space lease agreements are legal when, as practiced by Ameritox, they constitute an illegal kickback scheme and/or unlawful remuneration;

(b)    misleading physicians into ordering medically unnecessary testing by, among other things, encouraging them to order tests on the basis of patients' insurance coverage rather than their medical needs, and requiring them to order from an Ameritox-created panel of pre-selected tests rather than offering choice and transparency;

(c)    falsely representing to physicians that it is "in-network" with insurance providers when it is not; and

(d)    distributing false and misleading information about the Massachusetts Investigation and about its own compliance program and business practices to physicians.

159.    Ameritox's deceptive acts and practices have influenced, and will continue to influence, customer purchasing decisions because they cause physicians to choose Ameritox's services instead of those offered by Millennium.

160.    Ameritox, directly and through its agents, engages in this conduct in Nevada in order to retain a benefit for its dishonest conduct and to unfairly disrupt Millennium's business practices within the same market.

161.    Ameritox's conduct violates Nev. Rev. Stat. § 41.600 because Ameritox has engaged in deceptive trade practices under Nev. Rev. Stat. § 598.0915 by knowingly making false representations in transactions with health care providers.

162.    Millennium has been harmed by the wrongful and intentional actions of Ameritox, and is entitled to all remedies available under the law as set forth in its Prayer for Relief below.

## NINTH CAUSE OF ACTION
**(Violation of the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. §§ 75-1 et seq. – Injunctive Relief and Damages)**

163.    Millennium repeats and re-alleges all of the allegations contained in the foregoing paragraphs as if fully set forth herein.

164.    Ameritox, through its actions, as described above, has engaged in numerous deceptive acts and unfair practices in North Carolina by knowingly offering and providing kickbacks and other improper financial inducements to physician-consumers in exchange for the referral of business, in violation of federal and North Carolina law as well as the CIA.

165.    Ameritox's deceptive acts and unfair practices include, among other things:

(a)    providing physicians with free specimen processors under the condition that they submit a minimum number of urine samples for confirmatory testing;

(b)    directing specimen processors to perform clerical, administrative and other duties for physicians at no expense;

(c)    entering into lease agreements with physicians that are commercially unreasonable and involve the rental of space that is typically provided for free;

(d)    providing physicians with point-of-care testing cups and strips for free or below market value to generate extra revenue for physicians who use those cups to perform billable testing;

(e)     offering kickbacks to physicians in the form of free gift cards, dinners, office parties and other events, computers, and discounted non-Ameritox products;

(f)     misleading physicians into ordering medically unnecessary testing by, among other things, encouraging them to order tests on the basis of patients' insurance coverage rather than their medical needs, and requiring them to order from an Ameritox-created panel of pre-selected tests rather than offering choice and transparency;

(g)     falsely representing to physicians that it is "in-network" with insurance providers when it is not; and

(h)     distributing false and misleading information about the Massachusetts Investigation and about its own compliance program and business practices to physicians.

166.    Ameritox's deceptive acts and unfair practices have influenced, and will continue to influence, customer purchasing decisions because they cause physicians to choose Ameritox's services instead of those offered by Millennium.

167.    Ameritox, directly and through its agents, engages in this conduct in North Carolina in order to retain a benefit for its dishonest conduct and to unfairly disrupt Millennium's business practices within the same market.  Ameritox's conduct constitutes unfair methods of competition and unfair and deceptive acts and practices under N.C. Gen. Stat. § 75-1.1.

168.    Ameritox engaged in the foregoing unfair and deceptive acts and practices intentionally and willfully.

169. Millennium has been harmed by the wrongful and intentional actions of Ameritox and is entitled to all remedies available under the law as set forth in its Prayer for Relief below.

<u>**TENTH CAUSE OF ACTION**</u>
**(Violation of the Ohio Deceptive Trade Practices Act**
**Ohio Rev. Code § 4165 <u>et seq.</u>– Injunctive Relief and Damages)**

170. Millennium repeats and re-alleges all of the allegations contained in the foregoing paragraphs as if fully set forth herein.

171. Ameritox, through its actions, as described above, has engaged in numerous deceptive acts and practices in Ohio by knowingly offering and providing kickbacks and other improper financial inducements to physician-consumers in exchange for the referral of business, in violation of federal and Ohio law as well as the CIA.

172. Ameritox's deceptive acts and practices include, among other things:

(a) falsely representing that its specimen processor program and space lease agreements are legal when, as practiced by Ameritox, they constitute an illegal kickback scheme and/or unlawful remuneration;

(b) misleading physicians into ordering medically unnecessary testing by, among other things, encouraging them to order tests on the basis of patients' insurance coverage rather than their medical needs, and requiring them to order from an Ameritox-created panel of pre-selected tests rather than offering choice and transparency;

(c) falsely representing to physicians that it is "in-network" with insurance providers when it is not; and

(d)     distributing false and misleading information about the Massachusetts Investigation and about its own compliance program and business practices to physicians.

173.    Ameritox's deceptive acts and practices have influenced, and will continue to influence, customer purchasing decisions because they cause physicians to choose Ameritox's services instead of those offered by Millennium.

174.    Ameritox, directly and through its agents, engages in this conduct in Ohio in order to retain a benefit for its dishonest conduct and to unfairly disrupt Millennium's business practices within the same market.

175.    Ameritox's conduct violates Ohio Rev. Code § 4165.02 because Ameritox's conduct constitutes deceptive trade practices.

176.    Ameritox engaged in the foregoing unfair and deceptive acts and practices intentionally and willfully.

177.    Millennium has been harmed by the wrongful and intentional actions of Ameritox, and is entitled to all remedies available under the law as set forth in its Prayer for Relief below.

**ELEVENTH CAUSE OF ACTION**
**(Violation of the South Carolina Unfair Trade Practices Act,**
**S.C. Code §§ 39-5-10 et seq. – Injunctive Relief and Damages)**

178.    Millennium repeats and re-alleges all of the allegations contained in the foregoing paragraphs as if fully set forth herein.

179.    Ameritox, through its actions, as described above, has engaged in numerous deceptive acts and unfair practices in South Carolina by knowingly offering and providing kickbacks and other improper financial inducements to physician-consumers in exchange for the referral of business, in violation of federal and South Carolina law as well as the CIA.

180.   Ameritox's deceptive acts and unfair practices include, among other things:

(a)      providing physicians with free specimen processors under the condition that they submit a minimum number of urine samples for confirmatory testing;

(b)      directing specimen processors to perform clerical, administrative and other duties for physicians at no expense;

(c)      entering into lease agreements with physicians that are commercially unreasonable and involve the rental of space that is typically provided for free;

(d)      providing physicians with point-of-care testing cups and strips for free or below market value to generate extra revenue for physicians who use those cups to perform billable testing;

(e)      offering kickbacks to physicians in the form of free gift cards, dinners, office parties and other events, computers, and discounted non-Ameritox products;

(f)      misleading physicians into ordering medically unnecessary testing by, among other things, encouraging them to order tests on the basis of patients' insurance coverage rather than their medical needs, and requiring them to order from an Ameritox-created panel of pre-selected tests rather than offering choice and transparency;

(g)      falsely representing to physicians that it is "in-network" with insurance providers when it is not; and

(h)     distributing false and misleading information about the Massachusetts

Investigation and about its own compliance program and business

practices to physicians.

181.    Ameritox's deceptive acts and unfair practices have influenced, and will continue

to influence, customer purchasing decisions because they cause physicians to choose Ameritox's

services instead of those offered by Millennium.

182.    Ameritox, directly and through its agents, engages in this conduct in South

Carolina in order to retain a benefit for its dishonest conduct and to unfairly disrupt Millennium's

business practices within the same market.  Ameritox's conduct constitutes unfair methods of

competition and unfair and deceptive acts and practices under S.C. Code § 39-5-20.

183.    Millennium has been harmed by the wrongful and intentional actions of

Ameritox, and is entitled to all remedies available under the law as set forth in its Prayer for

Relief below.

## TWELFTH CAUSE OF ACTION
### (Common Law Unfair Competition)

184.    Millennium repeats and re-alleges all of the allegations contained in the foregoing

paragraphs as if fully set forth herein.

185.    Ameritox, as a competitor of Millennium, has engaged in deceptive and unfair

conduct in Connecticut, Delaware and Ohio by, among other conduct:

(a)     providing physicians with illegal kickbacks and financial inducements in

the form of sham "space lease" agreements and specimen processors who

perform prohibited clerical and administrative services for physicians at

no expense;

(b)        providing physicians with point-of-care testing cups and strips for free or below market value to generate extra revenue for physicians who use those cups to perform billable testing;

(c)        offering kickbacks to physicians in the form of free gift cards, dinners, office parties and other events, computers, and discounted non-Ameritox products;

(d)        misleading physicians into ordering medically unnecessary testing by, among other things, encouraging them to order tests on the basis of patients' insurance coverage rather than their medical needs, and requiring them to order from an Ameritox-created panel of pre-selected tests rather than offering choice and transparency;

(e)        falsely representing to physicians that it is "in-network" with insurance providers when it is not; and

(f)        distributing false and misleading information about the Massachusetts Investigation and about its own compliance program and business practices to physicians.

186.    Ameritox's actions are willful, oppressive, malicious, and fraudulent.

187.    As a proximate and direct result of the wrongful and intentional actions of Ameritox, Millennium has been harmed and is entitled to all damages from Ameritox as well as all other remedies provided under law, as set forth in its Prayer for Relief below.

### THIRTEENTH CAUSE OF ACTION
**(Common Law Tortious Interference with Business Relationship)**

188.    Millennium repeats and re-alleges all of the allegations contained in the foregoing paragraphs as if fully set forth herein.

189.    Millennium has business relationships with many physicians in Massachusetts, Connecticut, Delaware, Maine, Michigan, New Hampshire, New Mexico, Nevada, North Carolina, Ohio and South Carolina, and constantly is working to establish a business relationship with new physicians in each of these states.

190.    Ameritox is aware of Millennium's on-going business relationships and prospective business relationships with these physicians.

191.    Ameritox has intentionally and unjustifiably interfered with the relationships and prospective relationships between Millennium and health care providers in Massachusetts and elsewhere by disseminating false and misleading information about the Massachusetts Investigation and about its own compliance program and business practices.

192.    Ameritox has intentionally and unjustifiably interfered with the relationships and prospective relationships between Millennium and health care providers in Massachusetts, Connecticut, Delaware, Maine, Michigan, New Hampshire, New Mexico, Nevada, North Carolina, Ohio and South Carolina by, among other things:  providing physicians with sham "space lease" agreements and specimen processors who perform prohibited clerical and administrative services for physicians at no expense; providing physicians with free or below market value point-of-care testing cups and strips, gift cards, dinners, office parties and other events, computers, and discounted non-Ameritox products; providing physicians with opportunities to generate revenue for medically unnecessary testing; and disseminating false and misleading information to physicians about the Massachusetts Investigation and about its own compliance program and business practices.  The financial inducements that Ameritox provides to physicians constitute illegal kickbacks and/or unlawful remuneration.

193.     Ameritox's representations and actions were improper and made without any privilege for the purpose of inducing health care providers not to enter into or continue business or contractual relationships with Millennium.

194.     Ameritox was aware that the physicians to which it disseminated false and misleading information about Millennium and the physicians to which it offered illegal financial inducements were likely to do business with Millennium in the future and that Millennium anticipated receiving continued referrals from these health care providers.

195.     As a result of Ameritox's intentional and unjustified interference with Millennium's business relationships, Millennium has lost customers and prospective customers and, therefore, has been injured by Ameritox's tortious interference with Millennium's business relationships.

196.     Ameritox's actions were intentional and malicious, and have caused damage and irreparable harm to Millennium.

197.     Millennium is entitled to damages and all remedies available under the law, as set forth in its Prayer for Relief below.

## PRAYER FOR RELIEF

WHEREFORE, Millennium prays that this Court enter judgment in its favor and against Ameritox, and:

a.     Enjoin and restrain Ameritox, its agents, servants, employees, successors and assigns, and all others in concert or participation with them from continuing to disseminate false and misleading representations to health care providers, including but not limited to representations regarding the Massachusetts Investigation, representations about its own compliance program and business practices, representations regarding the legality of the provision of specimen collectors and/or processors to physicians, and representations regarding

the legality of encouraging health care providers to test on the basis of insurance coverage rather than medical necessity.

b. Enjoin and restrain Ameritox, its agents, servants, employees, successors and assigns, and all others in concert or participation with them, from the unlawful business practices described above, including but not limited to: continuing to undertake medically unnecessary tests based on payer reimbursement policies; implying that Ameritox has in-network status with insurers when it does not; continuing to offer physicians the provision of free specimen collectors and/or processors in exchange for a quota of samples, or to offer processors who perform prohibited clerical and administrative services for doctors; continuing to offer physicians commercially unreasonable "space lease" agreements by which Ameritox places a specimen collector and/or processor in the physicians' offices; continuing to make false and misleading representations regarding the legality of the provision of specimen collectors and/or processors to physicians; and continuing to offer other improper financial inducements and kickbacks such as gift cards, dinners, free or below market value point-of-care testing cups to be used for billable in-office testing, computers intended for regular use in a medical office, sponsored parties and other events, and discounted non-Ameritox products;

c. Award Millennium monetary relief for damages suffered, including without limitation its lost profits, Ameritox's ill-gotten profits, and other damages in an amount to be proven at trial;

d. Order Ameritox to engage in corrective advertising designed to correct the consumer confusion it has caused;

e. Decree that this is an exceptional case warranting an award to Millennium of its costs and expenses, including attorneys' fees, under federal law, pursuant to 15 U.S.C. § 1117(a).

f.　　Award Millennium its costs and expenses, including attorneys' fees, as permitted by law;

g.　　Award Millennium statutory damages, including multipliers and equitable enhancements, as permitted by law;

h.　　Award Millennium its costs and attorneys' fees, along with punitive damages, pursuant to Conn. Gen. Stat. § 42-110g;

i.　　Award Millennium its costs and attorneys' fees, along with treble damages, pursuant to Del. Code tit. 6, § 2533;

j.　　Award Millennium its costs and attorneys' fees pursuant to Me. Rev. Stat. tit. 10, § 1213;

k.　　Award Millennium its costs and attorneys' fees, along with enhanced damages, pursuant to Mass. Gen. Laws ch. 93A, § 11;

l.　　Award Millennium its costs and attorneys' fees, along with enhanced damages, pursuant to N.H. Rev. Stat. § 358-A:10;

m.　　Award Millennium its costs and attorneys' fees, along with treble damages, pursuant to N.M. Stat. § 57-12-10;

n.　　Award Millennium its costs and attorneys' fees pursuant to Nev. Rev. Stat. § 41.600;

o.　　Award Millennium treble damages pursuant to N.C. Gen. Stat. § 75-16;

p.　　Award Millennium its costs and attorneys' fees pursuant to Ohio Rev. Code § 4165.03.

q.　　Award Millennium its costs and attorneys' fees, along with treble damages, pursuant to S.C. Code § 39-5-140;

r.      Award Millennium punitive damages, as permitted by law;

s.      Award Millennium prejudgment and other interest on all monetary damages, as permitted by law; and

t.      Grant such other and further relief as this Court may deem just and equitable.

## DEMAND FOR JURY TRIAL

Millennium demands a trial by jury as to all claims triable of right to a jury.

Dated:  July 17, 2013                Respectfully submitted,

/s/  Peter Simshauser
James R. Carroll (BBO #554426)
Peter Simshauser (BBO #665153)
Christopher A. Lisy (BBO #662283)
SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
One Beacon Street
Boston, Massachusetts 02108
(617) 573-4800
James.Carroll@skadden.com
Peter.Simshauser@skadden.com
Christopher.Lisy@skadden.com

*Counsel for Plaintiff*
*Millennium Laboratories, Inc.*